**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | **CR. NO. 08-041ML** |
| | ) | |
| **JUAN ANTONIO LOPEZ-ACEVEDO** | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

The government respectfully urges the Court to deny the defendant's motion to suppress because the agents had probable cause to arrest the defendant and conduct a search of his vehicle. Moreover, the defendant consented to the search after being advised of his rights under the Fifth Amendment. Additionally, after being apprised of his rights, the defendant voluntarily waived his right against self-incrimination and engaged in an interview with the agents.

## FACTS

In the months preceding March 23, 2008, agents with the U.S. Drug Enforcement Administration (DEA) conducted an investigation into the distribution of heroin and cocaine in Rhode Island and elsewhere. On March 17, 2008, the Honorable William E. Smith signed an order authorizing the interception of wire communications occurring over a telephone used by Ricardo Quezada a/k/a MONSTRO. Pursuant to the wiretap order, agents intercepted several telephone calls that led them to conclude that Ricardo Quezada would meet with his supplier at a location in Connecticut on March 23, 2008.

Specifically, on March 20, 2008, Quezada spoke with an individual, later

identified as Willy Reyes, and in coded language, Quezada instructed Reyes to collect money in anticipation of a meeting with Quezada's supplier on Sunday (March 23, 2008).[1] Quezada spoke with Reyes again on March 21, 2008, and several times again on March 22, 2008.

During the telephone conversations on March 22, 2008, agents maintained surveillance on Quezada. They observed Quezada park his car at La Rocha Restaurant. Quezada entered and then shortly thereafter exited the restaurant. He walked over to the passenger side of another car, opened the passenger door, and reached under the front passenger side seat. He appeared to be looking for an article. Quezada called Reyes again and Reyes directed him to a particular location within the vehicle. Quezada exited the vehicle and placed a package in the front of his pants. He then drove away in his car. When a male from inside the restaurant left in the car from which Quezada had retrieved the package, officers stopped the male and identified him as Willy Reyes.[2] Reyes was driving a rental car.

Several hours later on March 22, 2008, Quezada called a New York number and spoke to a male, now known as Lopez. New York is a known source location for narcotics in this area. Quezada, using coded language, spoke with Lopez about

1 Because the intercepted telephone calls are subject to a limited disclosure order, the government will only reference the calls generally in its response. The government will file transcripts of the calls with a motion to seal as exhibits to the government's response.

2 Willy Reyes has been convicted of at least two felony narcotics offense. Furthermore, numerous informants over the last six years have provided agents with information about Willy Reyes' heroin trafficking activities.

meeting the next day, Easter Sunday.

In the early morning hours of March 23, 2008, agents began to conduct surveillance on Quezada. Agents followed Quezada south on I-95. During this time, he spoke with Lopez again about meeting at a rest area. Quezada also spoke with Reyes again. Agents continued to follow Quezada to a rest area on I-95 in Connecticut. Quezada parked his vehicle on the north side of the McDonald's at the rest area. Agents then observed a man, later identified as Lopez, get into Quezada's vehicle and sit in the front passenger seat. Agents watched Lopez and Quezada have a short conversation in the vehicle. It appeared to the agents that Lopez and Quezada were counting money.

After several minutes, Lopez exited Quezada's car and got into a white Jeep Cherokee bearing a Massachusetts registration. Lopez drove to a section of the rest area with gas pumps, stopped, but did not pump any gas. Shortly thereafter, Lopez left the rest area parking lot and headed south on I-95. Agents followed Lopez. An agent contacted the Connecticut State Police and asked that the state police conduct a traffic stop of Lopez's Jeep.

Once Lopez's vehicle was stopped, he was removed from the Jeep at gunpoint and brought to its rear where he was met by TaskForce Agent (TFA) Michael Naylor, TFA Joseph Colonduano and Detective Andre Perez. During a frisk, TFA Colanduano seized a large roll of U.S. Currency, which was wrapped in a small, elastic band, from LOPEZ's pocket. The roll of money contained $971 in small denominations.

Detective Perez read Lopez his Miranda rights in Spanish, and then asked him if he understood English. Lopez said, "I speak pretty good English." Lopez was asked if he understood his Miranda rights and he said "I know what you are talking about. I do." Asked his name, Lopez identified himself as Geraldo Golondres. Lopez said he was from Puerto Rico, although he became indignant when agents began to question him about locations in Puerto Rico. When asked what he was doing at the rest area, Lopez said that he stopped to use the bathroom. DEA agents asked Lopez if he had any drugs or money on his person, and he pointed to TFA Colonduano and said, "he took my money around $600." Agents also asked Lopez if he had any drugs or money in the vehicle, and he said, "No. None. You can check." Lopez was asked if the vehicle could be searched and he agreed.

A narcotics canine began to search the vehicle. The dog indicated on the rear driver-side seat. TFA Naylor and Connecticut State Trooper Griffin then located a plastic bag containing $16,871 in United States currency near the rear driver-side seat. Agents also found four cellular telephones in the vehicle. TFA Robert Enright dialed the New York number intercepted on the wiretap and one of the defendant's telephones began to ring.

TFA Naylor said to Lopez, "I thought there was no money in the car." Lopez stated, "Well there is no drugs." Agents then began to question Lopez about the money. He admitted that he got it from "Ricardo" and when shown a picture of Quezada he identified him. Lopez said that he was shipping a truck to the Dominican

Republic for Quezada and that was why he had met with Quezada.

Agents drove Lopez to the DEA offices in Warwick, Rhode Island, where he was further questioned by agents. At DEA, Lopez admitted that he was using an alias and he admitted to selling heroin to Quezada. The agents recorded part of this confession, wherein Lopez detailed the conspiracy in which he was involved. The conversation was in both English and Spanish, and a transcript of the interview is submitted as Exhibit 12.

The defendant was charged in federal court by complaint and had an initial appearance on March 24, 2008. One week later, on April 1, 2008, TFA Dennis Smith obtained a search warrant for the defendant's Jeep, which had been impounded by the Connecticut State Police, and a fifth cellular phone, which Lopez had claimed was still inside the Jeep. During this second search, agents found a hidden compartment containing a t-shirt and a knife, and the fifth cellular phone belonging to Lopez.

Lopez was 39 years-old at the time of his arrest. This was not the first time he had been arrested. On April 11, 1988, Lopez was arrested for possession of narcotics and loitering in New York. On November 11, 1988, he was again arrested for possession of narcotics in New York. On August 18, 1993, Lopez was arrested in Massachusetts and charged with trafficking heroin.

## ARGUMENT

### I. THE STOP AND SEARCH OF THE DEFENDANT'S VEHICLE WAS SUPPORTED BY PROBABLE CAUSE

The defendant argues that his arrest by the officers and agents was unlawful; however, the agents had probable cause to arrest the defendant and search Lopez's Jeep. Probable cause for a warrantless arrest exists if the collective knowledge of the officers involved was sufficient to lead a prudent person to believe that the defendant was committing or had committed an offense. See United States v. Link, 238 F.3d 106, 109 (1st Cir. 2001). Probability, not proof beyond a reasonable doubt, is the touchstone of the probable cause determination. See United States v. Aguirre, 839 F.2d 854, 857-58 (1st Cir. 1988). The focus is on the likelihood, not certitude, of criminal activity. See Acosta v. Ames Department Stores, Inc., 386 F.3d 5, 9 (1st Cir. 2004). Thus, the officer's conclusion need not be ironclad, or even highly probable. See United States v. Winchenbach, 197 F.3d 548, 555-56 (1st Cir. 1999). Nor must the officer's conclusions be more likely true than false. See United States v. Feliz, 182 F.3d 82, 87 (1st Cir. 1999). Rather, the arrest is justified if under a totality of the circumstances known at the time, the officers had information upon which a "'reasonably prudent person would believe the suspect had committed or was committing a crime.'" United States v. Vongkaysone, 434 F.3d 68, 73 (1st Cir. 2006) (quoting United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997)).

A warrantless search of a vehicle is justified if the agents had probable cause to

believe that the car held contraband. See United States v. Lopez, 380 F.3d 538, 543 (1st Cir. 2004). The automobile exception justifies a warrantless search of a motor vehicle regardless of whether there was time to obtain a warrant, or whether the search occurred after the vehicle was in police custody. See United States v. Panitz, 907 F.2d 1267, 1271 (1st Cir. 1990) ("[S]o long as the vehicle search is supported by probable cause, no particular exigency (beyond the inherent mobility of any motor vehicle) need exist."). That is, although the officers might have had time to secure a warrant, there is no requirement that they do so. See id. at 1271 ("the existence of probable cause justifies a warrantless seizure and reasonable search of a motor vehicle lawfully stopped in transit or parked in a public place, whether or not exigent circumstances prevailed at either the time of the seizure or the time of the search.").

In this case, the DEA agents that requested the stop of Lopez's Jeep believed they had just observed a meeting between a drug dealer (Quezada) and his supplier (Lopez). See, e.g., United States v. Reyes, 225 F.3d 71, 75-76 (1st Cir. 2000) (recognizing that while a person's "'mere propinquity to others independently suspected of criminal activity'" does not, without more, give rise to probable cause, officers are not required to "'divorce themselves from reality or to ignore the fact that 'criminals rarely welcome innocent persons as witnesses to serious crimes and rarely seek to perpetrate felonies before larger-than-necessary audiences.''"). The conversations intercepted from the wire tap revealed that Quezada had arranged to meet a contact in Connecticut. Based upon their training and experience, the agents interpreted the language used in the

conversation to be code for a drug related transaction.

Having heard conversations which the agents believed pertained to a drug transaction, they then conducted surveillance to confirm their belief. The agents saw Quezada meet with Reyes, and then the next day, they observed Quezada and Lopez meet briefly at the rest stop. To the agents watching the meeting, it looked as if Lopez and Quezada were counting money. Given the coded language used during the phone conversation and the agent's belief that it pertained to drugs, the agent's determination that the money they believed was being counted was the proceeds of drug crimes is a reasonable inference. This belief is supported by the short period of time for which the men met, as well as the stop Lopez made at the gas pumps before leaving the rest area. See, e.g., Vongkaysone, 434 F.3d at 75 (upholding the arrest and search of the defendants' vehicle based upon the information from the proffer of a first-time informant, which was corroborated by the surveillance of a meeting by agents); United States v. Funches, 327 F.3d 582, 586-87 (7th Cir. 2003) (upholding the arrest and search of the defendants and their vehicles based upon the experienced agents' observations of an otherwise unexplainable meeting recognized as common in drug deals). The brief meeting could have indicated that Lopez and Quezada were attempting to keep their contact with one another to a minimum in order to avoid detection. The stop at the gas pumps could have indicated that Lopez was attempting to see if he was being followed.

Viewing these facts collectively, it was reasonable for the agents to believe that Lopez and Quezada had just transacted business involving the distribution of heroin,

an overt act in furtherance of a conspiracy. Lopez was stopped and his vehicle searched because DEA agents suspected this crime had just been committed. Indeed, this case compares favorably with others in which probable cause has been found. See, e.g., United States v. Seymour, 519 F.3d 700, 713 (7th Cir. 2008) (finding probable cause to stop the defendant's car and conduct a search based upon wire tap interceptions indicating defendant would be transporting a "black box," code for contraband); United States v. Howard, 489 F.3d 484, 491 (2d Cir. 2007) (finding probable cause to search defendant's vehicle based upon six intercepted telephone conversations); United States v. Castaneda, 438 F.3d 891, 893 (8th Cir. 2006) (concluding that officers had probable cause to conduct the automobile searches based upon the intercepted telephone conversations and surveillance of a meeting between the targets); United States v. Ramirez, 60 Fed.Appx. 130, 132-33 (9th Cir. 2003) (unpublished) (concluding that the officers had probable cause to stop and search the vehicle based upon intercepted drug-related conversations and surveillance of the defendant's arrival and departure from a particular location); Reyes, 225 F.3d at 75-76 (finding probable cause to arrest defendant when defendant was seen exiting and entering residence with known and suspected drug dealers and defendant acted in manner consistent with prior suspected drug activity); United States v. Dialo, 29 F.3d 23, 26 (1st Cir. 1993) (upholding warrantless arrest based upon prior surveillance, tip from informant that defendants would be making delivery that night, and suspicious activity of defendants, even though the informant's tip proved to be partially inaccurate). Considering all of the facts known to

the agents, they had probable cause to stop and search Lopez's vehicle.

## II. DEFENDANT FREELY AND VOLUNTARILY CONSENTED TO A SEARCH OF HIS VEHICLE

Even if the Court were to conclude that the agents lacked probable cause, there was reasonable and articulable suspicion to justify a stop of the defendant's vehicle. See United States v. Sandoval-Espana, 459 F.Supp.2d 121, 131-32 (D.R.I. 2006) (upholding a stop of the defendants' vehicles based upon the corroborated information of a first-time informant and concluding that the defendants were not subject to a de facto arrest despite handcuffing). Upon stopping the defendant, the agents obtained the defendant's consent to search his vehicle. Accordingly, the search of the defendant's vehicle was proper.

The defendant argues that his consent was invalid because he was the subject of an illegal arrest. However, the mere fact that a reasonable person would not feel free to leave under the circumstances does not establish a de facto "arrest" for Fourth Amendment purposes, just as it does not establish "custody" for Fifth Amendment purposes. See United States v. Trueber, 238 F.3d 79, 91-95 (1st Cir. 2001) (Fifth Amendment case); United States v. Acosta-Colon, 157 F.3d 9, 13 (1st Cir. 1998) (Fourth Amendment case); United States v. Cardoza, 129 F.3d 6, 15-16 (1st Cir. 1997) (Fourth Amendment case); United States v. Ventura, 85 F.3d 708, 712 (1st Cir. 1996) (Fifth Amendment case). The terms "custody" and "arrest" are terms of art and they have a narrow meaning in this circuit. See, e.g., United States v. Fornia-Castillo, 408 F.3d 52,

64-65 (1st Cir. 2005) ("neither the use of handcuffs nor the drawing of a weapon necessarily transforms a valid Terry stop into a defacto arrest); United States v. Maguire, 359 F.3d 71, 78-79 (1st Cir. 2004) (no de facto arrest when officers drew their weapons and wrestled defendant to the ground); Flowers v. Fiore, 359 F.3d 24, 29-31 (1st Cir. 2004) (defendant was not under de facto arrest when officers drew their weapons, ordered him onto his knees, handcuffed and placed him in back of police cruiser); United States v. Lee, 317 F.3d 26, 31-32 (1st Cir. 2003) (officer who drew his weapon and blocked suspect's vehicle with police cruiser did not effectuate de facto arrest); Trueber, 238 F.3d at 94-95 (no custody or de facto arrest where five officers stopped truck and one of them briefly pointed gun at defendant); United States v. Taylor, 162 F.3d 12, 21-22 (1st Cir. 1998) (defendants not under de facto arrest when police cars blocked in their car, 10-12 officers surrounded them, at least two officers drew their weapons, defendants were placed face-down on the ground and frisked, and the detention lasted about 30 minutes); United States v. Jackson, 918 F.2d 236, 238-40 (1st Cir. 1990) (defendant not under de facto arrest when police blocked in his car, approached him with weapons drawn, and frisked him for weapons); United States v. Quinn, 815 F.2d 153, 155-59 (1st Cir. 1987) (defendant not under de facto arrest when police blocked his car, he was surrounded by five officers, he was interrogated for 25 minutes late at night at a remote cottage, and police would not give him back his identification); United States v. Trullo, 809 F.2d 108, 113 (1st Cir.) (defendant held at gunpoint by police officer not under de facto arrest), cert. denied, 482 U.S. 916 (1987).

In this case, while the Connecticut State Troopers removed the defendant from his Jeep at gunpoint, and he was immediately brought to the DEA Taskforce agents, who did not have weapons drawn. The defendant was not placed in a patrol car, but instead questioned on the side of the road. The defendant was advised of his Miranda rights and within a few minutes asked for consent. In light of these facts, the defendant was not under arrest at the time that he gave consent. Accordingly, the defendant's attempts to invalidate that consent on the basis of an alleged illegal arrest are without merit.

A search conducted pursuant to a valid consent is constitutionally permissible even in the absence of probable cause. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). "In order to be effective, a person's consent to a search must be freely and voluntarily given." United States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999); see, e.g., United States v. Espinosa-Orlando, 704 F.2d 507, 513 (11th Cir. 1983) (finding consent to search voluntary even though the defendant was on the ground, at the side of the road, with at least one weapon drawn but not pointed at him). "Voluntariness turns on a number of factors, including the person's 'age, education, experience, intelligence, and knowledge of the right to withhold consent.'" Coraine, 198 F.3d at 309 (quoting United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993)). "The court can also consider 'whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances.'" Coraine, 198 F.3d at 309; cf. United States v. Blais, 98 F.3d 647,

650-51 (1st Cir. 1996) ("[W]hile the failure to inform an individual that he has a right to withhold consent is a factor to be weighed in determining the issue of voluntariness, such a failure does not preclude a finding of valid consent.").

Although the defendant in this case was ordered from his Jeep at gunpoint, he was immediately turned over to the DEA agents, whose guns were holstered. See United States v. Barnett, 989 F.2d 546, 556 (1st Cir. 1993) (considering the fact that the firearms were holstered by the time consent was obtained in assessing the voluntariness of the consent). The defendant was advised of his Miranda rights before consent was sought. Moreover, the defendant in this case volunteered consent before the agents asked him if they could search his vehicle, and consent was obtained within a few minutes of the stop. "Notwithstanding the inherently unnerving effect of having numerous officers arrive at one's door with guns drawn," the defendant's experience with narcotics arrests make him presumptively "'less likely than most to be intimidated by the agents' show of force.'" See id. (quoting United States v. Cepulonis, 530 F.2d 238, 244 (1st Cir. 1976)).

While the government contends that the agents had probable cause to arrest Lopez prior to the search of his Jeep, it is absolutely undeniable that there was probable cause to arrest him after the search. By the time the search was concluded, the agents had seized the money, the cell phones, and had determined that the defendant lied about his name and his claimed use of the bathroom at the rest area. With these additional facts, probable cause cannot be denied.

## III. DEFENDANT VOLUNTARILY WAIVED HIS FIFTH AMENDMENT RIGHTS

To the extent the defendant challenges the voluntariness of his confession, the government maintains that the defendant engaged in a voluntary interview with the agents after having been advised of his Miranda rights. As in the case of a challenge to the voluntariness of the defendant's consent, an admission is considered voluntary unless the "will of the defendant was overborne so that the statement was not his free and voluntary act." Jackson, 918 F.2d at 241. "After assessing the totality of the circumstances attending a defendant's confession, see, e.g., 18 U.S.C. § 3501(b), [the Circuit Court] will affirm the denial of a motion to suppress provided the government proved, by a mere preponderance of the evidence, that there was a valid waiver." United States v. Rojas-Tapia, 446 F.3d 1, 5 (1st Cir. 2006); see United States v. Palmer, 203 F.3d 55, 62 (1st Cir. 2000).

Lopez gave his confession voluntarily. Agents read Lopez his rights in Spanish when he was arrested. Agents reminded Lopez of these rights before Lopez's confession was recorded. As discussed in section II, Lopez is 39-years-old and has been arrested multiple times. His command of the English language was strong enough to suggest that officers search his vehicle and to take part in an elaborate conversation where he explained his role in the drug trafficking conspiracy to agents. A significant portion of the interview was in English, and the rest was in Spanish when requested by the defendant. These facts are evidence of Lopez's ability to understand the questions

agents posed to him and the consequences of his answers. Lopez' confession was voluntarily and admissible as evidence against him.

**CONCLUSION**

For all the foregoing reasons, the defendant's arrest was valid and the evidence against him admissible. As such, his motion should be denied.

Respectfully submitted,

UNITED STATES OF AMERICA,
By its Attorneys,

ROBERT C. CORRENTE
United States Attorney

/s/ SANDRA R. BECKNER
SANDRA R. BECKNER
Assistant U. S. Attorney
NY Bar
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
sandra.beckner@usdoj

**CERTIFICATE OF SERVICE**

I hereby certify that on July 11, 2008, a copy of the within "Government's Response to Defendant's Motion to Suppress" was filed electronically and is available for viewing and downloading from the ECF system.

Electronic notification:

Mr. Benjamin Mesiti
597 Broad Street
Central Falls, Rhode Island 02863

/s/ SANDRA R. BECKNER
SANDRA R. BECKNER
Assistant U. S. Attorney
NY Bar
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
sandra.beckner@usdoj